## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| ALYSSA PRUSAK, | ) | CASE NO. 5:24-CV-2216-DAR |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID A. RUIZ |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTATE JUDGE |
| COMMISIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      INTRODUCTION

The Commissioner of Social Security[1] denied Plaintiff Alyssa Prusak's application for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB). Ms. Prusak seeks judicial review of that decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). (Compl., ECF No. 1.) This matter is before me pursuant to Local Rule 72.2(b). (*See* ECF non-document entry dated December 19, 2024.)

For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II.      PROCEDURAL HISTORY

In May 2022, Ms. Prusak applied to the Social Security Administration (SSA) for a period of disability and disability insurance benefits (DIB). (Tr. 216.)[2] She identified that she became disabled on January 30, 2022. (*Id.*) In July 2022, Ms. Prusak applied to the SSA seeking SSI

---

[1] Carolyn W. Colvin was serving as Acting Commissioner of Social Security when the complaint was filed. She served in that role until January 2025. A series of acting commissioners led the Agency until May 2025, when Frank Bisignano, the current Commissioner, was confirmed.

[2] The administrative transcript appears at ECF No. 6. I will refer to pages within that transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 28"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 9") and page-identification numbers (e.g., "PageID# 787").

benefits; she claimed that she became disabled on January 1, 2022. (Tr. 209.) She listed eight allegedly disabling conditions: (1) bipolar II disorder; (2) attention-deficit/hyperactivity disorder; (3) generalized anxiety disorder; (4) post-traumatic stress disorder; (5) "major depressive episodes"; (6) panic disorder without agoraphobia; (7) diastasis recti; and (8) postpartum depression. (Tr. 240.)

The SSA denied Ms. Prusak's application initially and upon reconsideration. (Tr. 56–57, 67, 77, 91, 92–93, 107.) Ms. Prusak requested a hearing before an administrative law judge (ALJ). (Tr. 136.) The ALJ held a hearing on October 25, 2023, at which Ms. Prusak was represented by counsel. (Tr. 33–55.) Ms. Prusak testified, as did an independent vocational expert (VE). (*Id.*)

On December 13, 2023, the ALJ issued a written decision finding that Ms. Prusak is not disabled. (Tr. 14–32.)

Ms. Prusak requested review of the ALJ's decision. (Tr. 204–05.) On October 23, 2024, the Appeals Council denied review, rendering the ALJ's decision final. (Tr. 1.)

On December 19, 2024, Ms. Prusak filed her Complaint, challenging the Commissioner's decision that she is not disabled. (ECF No. 1.) Ms. Prusak asserts the following assignment of error:

> The administrative law judge's finding concerning the Plaintiff's residual functional capacity is not supported by substantial evidence.

(Pl.'s Merit Br., ECF No. 9, PageID# 787.)

III.    **BACKGROUND**[3]

A.    **Personal, Educational, and Vocational Experience**

Ms. Prusak was born in August 1996 and was 25 years old on the date of her application. (Tr. 35, 209.) She graduated high school and completed one year of college courses. (Tr. 241.) She lives with her fiancé and their young daughter. (Tr. 40.) She maintains a driver's license and is able to drive. (*Id.*) She has not worked since January 2022. (Tr. 41.) She had previously worked for an internet retailer, at a retail store, and as a manager at a fast-food restaurant. (Tr. 241–42.) She previously served the country honorably as a member of the National Guard. (*See* Tr. 573.)

B.    **Function Reports**

Ms. Prusak completed a function report on August 12, 2022. (Tr. 250–58.) She identified that it was difficult for her to leave the house without getting anxious. (Tr. 250.) She described getting "flustered" and stuttering as her face and body become red and "splotchy." (*Id.*) She feels cold, even as she begins sweating "profusely." (*Id.*) She said that she gets only four to six hours of interrupted sleep most nights. (*Id.*) She loses her phone, medicine, and papers throughout the day, as her memory has been "severely affected." (*Id.*)

Describing her daily routine, Ms. Prusak wrote that she wakes up and takes care of her infant daughter before letting their dogs outside, having coffee, and looking at her phone "for a bit." (Tr. 252.) She then plays with her daughter until her daughter sleeps, at which point she will "hopefully" sleep, too. (*Id.*) She continues that pattern until her fiancé gets home from work, after which she makes dinner. (*Id.*) Most of the meals she makes are sandwiches or frozen meals, although she makes "complete meals" for their weekend dinners. (Tr. 253.) She is usually awake

---

[3] Ms. Prusak's assignment of error concerns alleged non-exertional limitations stemming from her mental health conditions. Accordingly, I limit my discussion of the record to those portions relevant to Ms. Prusak's mental health conditions and resulting limitations.

until two o'clock in the morning, at which point she can fall asleep using melatonin. (Tr. 252.) She has nightmares every night. (*Id.*)

Ms. Prusak takes care of all caregiving tasks for her infant daughter, and she takes care of the family dogs. (*Id.*) Her fiancé helps with cooking when Ms. Prusak is taking care of their daughter. (*Id.*) Ms. Prusak is able to care for her personal hygiene needs, but she seldom finds time to eat when she is "manic." (*Id.*) She often forgets to take medication, even with phone reminders. (Tr. 253.) She does household chores—including laundry, dishes, vacuuming, and dusting— around twice a week. (*Id.*)

Ms. Prusak wrote that she avoids going out alone because she struggles to interact with others and wants to avoid "awkward social encounters." (Tr. 254.) She shops once or twice a month for groceries, diapers, and personal care items over the internet or phone. (*Id.*) She has found that she is increasingly impulsive when it comes to money; she makes impulsive purchases. (*Id.*)

Ms. Prusak does not have hobbies; she spends most of the day cleaning and caring for her daughter. (Tr. 255.) She is not able to multitask and finds that she is not able to tolerate background noise when she is having a conversation, cooking, or cleaning. (*Id.*) She visits family around once a month, but she finds herself "hid[ing] away" with her daughter or sitting with a small group of trusted people. (*Id.*) She often cancels social engagements and finds it difficult to speak with her family. (*Id.*) She goes to doctor's appointments once or twice per month. (*Id.*)

Ms. Prusak identified that she stutters when she speaks, or she speaks "incredibly slow," because she struggles to find the right words. (Tr. 256.) She has a short temper and no real short-term memory. (*Id.*) She can pay attention for "maybe a couple minutes" at a time, often missing steps when following instructions. (*Id.*) She struggles to fully comprehend spoken instructions. (*Id.*) She does not handle stress well, but she is "average" when it comes to handling changes to

4

routine. (Tr. 257.) She has found herself being hypervigilant when it comes to her daughter's safety and has daily nightmares. (*Id.*)

On December 8, 2022, Ms. Prusak reported that she was continuing to seclude herself at home, experiences a lack of motivation and energy, and has anxiety around leaving the home. (Tr. 270.) She described a continued "fear of germs" and endorsed intrusive thoughts about harm coming to her family. (*Id.*) She identified that she was "lacking" in personal hygiene and said she was unable to concentrate on tasks or partake in hobbies. (*Id.*)

### C. <u>Relevant Hearing Testimony</u>

#### 1. *Ms. Prusak's Testimony*

Ms. Prusak testified that she has panic attacks that keep her from working. (Tr. 42.) She described that, during an attack, her breathing becomes faster and shallower. (*Id.*) Her body becomes "numb," and she feels hot except her body is cold to the touch. (*Id.*) She then develops a rash and feels "like an out of body experience where it doesn't feel like I'm physically in my body." (Tr. 42–43.) She becomes lightheaded, dizzy, and shaky, and she has "no strength." (Tr. 43.)

Ms. Prusak tries to control these attacks by staying home and, during an attack, by using methods she used in therapy to control her thoughts. (Tr. 42–43.) Once she removes herself from the triggering situation, it takes a "couple hours" for her to calm down using controlled-breathing techniques, after which she feels "completely exhausted." (Tr. 44.)

She had these panic attacks nearly every shift when she was working, hiding in a bathroom and often leaving early, sometimes after only an hour. (Tr. 42–43.) Now, she experiences them whenever she leaves the house for an extended period of time. (Tr. 43.) She finds that crowds, phone calls, and stress are triggers for her. (*Id.*) She "white knuckle[s]" her steering wheel when she has to leave the house, and she orders her groceries online. (Tr. 42.) She has panic attacks at home, too, approximately once per week. (Tr. 44.)

5

Ms. Prusak tried medication to manage her symptoms from 2020 through 2022, but the medication "did not help at all." (Tr. 45, 48.) She is not currently taking medication, but she is involved in therapy. (Tr. 45.) She had been going to therapy monthly, but she changed her appointments to be every other month "to leave [herself] with more time to work on the exercises" the therapist suggested. (*Id.*)

Ms. Prusak leaves the house twice a month to go grocery shopping with her fiancé and daughter. (Tr. 45–46.) She also leaves the house around once a month for family events. (Tr. 46.) She often turns down invitations or cancels appointments, even to see family. (Tr. 49.) She has tried walking her daughter around a neighborhood park, but she finds that there are often neighbors there who "want[] to have an interaction . . . and then I freak out and I just stay inside." (Tr. 46.)

Ms. Prusak testified that she is able to interact civilly with others, like grocery-store clerks, but she finds herself rushing through the interactions and "always leave[s] . . . feeling like [she] was very awkward and robotic." (Tr. 47.)

Ms. Prusak also described what she characterized as obsessive behavior. She cannot let her daughter crawl on floors before first feeling the floor herself to ensure it is not dirty. (Tr. 49–50.) Ms. Prusak has to clean and sanitize the stroller, car seat, or grocery carts before placing her daughter in them. (Tr. 50.) She finds that she is "hyperaware" of her surroundings, afraid based on news reports of "kidnappings and human trafficking and everything else." (*Id.*)

Ms. Prusak feels unmotivated almost every day. (Tr. 50–51.)

Most days, Ms. Prusak wakes up, gets her daughter ready, drinks coffee, and then "stare[s]" at things that need to be done, like dishes or laundry. (Tr. 51.) She is sometimes able to "kickstart" herself to tackle these chores, but there are weeks that she does little except for sitting on the couch. (*Id.*) This pattern was not improved with medication. (*Id.*)

### 2.    *Vocational Expert's Testimony*

Lynn Smith testified as a vocational expert (VE). (Tr. 52.) The VE classified Ms. Prusak's past relevant work as that of "internet sales" (DOT 299.357-014), "shipping and receiving" (DOT 222.387-050), and "manager" (DOT 185.137-010).

The ALJ asked the VE to assume that an individual with Ms. Prusak's age, education, and work experience had the ability to perform work with no exertional limitations but with certain other limitations. (Tr. 53.) Specifically, the individual could attend to and carry out multistep tasks of a routine and repetitive nature, but not at a production-rate pace. (*Id.*) The individual could interact with others only on an occasional and superficial basis, meaning no tasks involving arbitration, negotiation, conflict resolution, or responsibility for the safety and welfare of others. (*Id.*) The individual could adapt to infrequent changes in a work setting or in their duties, as long as those changes are explained or demonstrated in advance. (*Id.*)

The VE testified that such a hypothetical person could not perform any of Ms. Prusak's past relevant work, but would be able to perform the work of a "kitchen helper," "floor waxer," or "laundry worker." (Tr. 53–54.)

In response to questions by Ms. Prusak's counsel, the VE testified that an individual can be off-task no more than ten percent of the time to maintain competitive employment. (Tr. 54.) An individual can be absent from work, or leave early from work, no more than once per month. (*Id.*)

Ms. Prusak's counsel asked the VE to consider that the hypothetical person considered above was further limited, in that they could have no interaction with the general public and no interaction with coworkers or supervisors. (*Id.*) The VE testified that no work exists in the national economy for such a person. (*Id.*)

### D. <u>State Agency Consultants</u>

A physician (Vankatachala Sreenivas, M.D.), a psychologist (Deryck Richardson, Ph.D.), and a disability examiner (Amy Curry) examined Ms. Prusak's claim at the initial administrative level. (Tr. 56–77.)

Dr. Richardson opined that Ms. Prusak has a mild limitation with respect to her ability to understand, remember, and apply information. (Tr. 63.) He opined that Ms. Prusak has moderate limitations with respect to her ability to interact with others; concentrate, persist, or maintain pace; and adapt or manage herself. (*Id.*) After reviewing the record evidence, Dr. Richardson concluded that Ms. Prusak's "subjective reports are more severe than the objective evidence," noting that most of the medical status evaluations in the record were within normal limits "with the exception of aberrations in mood and affect." (*Id.*) The consultants pointed out that Ms. Prusak is able to care for an infant and pets; can prepare dinner; can complete chores "depending on mood"; is able to drive, shop online, and manage finances; was able to work until she gave birth in 2022, and noted that she planned on going back to school while on maternity leave. (Tr. 64.)

Dr. Richardson concluded that Ms. Prusak retained the ability to understand and recall multistep instructions for routine tasks in the absence of a rapid pace, would not need more oversight than is found in "many entry level positions," would be able to maintain superficial and occasional contact with others, and would be able to adapt to infrequent job-related changes that are introduced in advance and easily explained. (Tr. 65–66.)

Based on this opinion, the consultants concluded that Ms. Prusak was limited to unskilled work but would be able to perform work at any exertional level. (Tr. 66–67.) They identified that she would be capable of performing work such as that required of a cleaner/housekeeper, table cover folder, or mail sorter. (Tr. 67.) Therefore, they concluded that she was not disabled. (*Id.*)

In a letter to Ms. Prusak explaining this decision, the SSA wrote that, while she does have limitations related to her mental health conditions, she is "able to perform daily activities adequately" and is "capable of performing tasks that are similar to some work tasks that do not require more than superficial interaction with others, and does not require fast paced production demands." (Tr. 112.)

At the reconsideration level, a physician (Gerald Klyop), a psychologist (Suzanne K. Castro, Psy.D.), and a disability examiner (Andrea Janis) reviewed Ms. Prusak's claim. (Tr. 78–107.)

Dr. Castro noted that Ms. Prusak alleged no worsening of her symptoms after the initial review level. (Tr. 100.) Dr. Castro reviewed additional records submitted at the reconsideration level and noted that a January 25, 2023 mental status examination was normal except for a depressed mood and flat affect. (*Id.*) Dr. Castro opined that the findings at the initial review level were "fully supported by and consistent with the totality of [the] evidence in [the] file." (*Id.*)

Based on their conclusion that the initial-level findings were supported, the consultants found that Ms. Prusak was not disabled. (Tr. 107.)

In a letter to Ms. Prusak explaining this decision, the SSA wrote that "despite your history of emotional difficulties, you are still able to perform less complicated types of work." (Tr. 131.)

### E. <u>Relevant Medical Evidence</u>

Ms. Prusak had a telephone appointment with Dr. Leilani Mahi on March 1, 2021. (Tr. 496.) Ms. Prusak complained of depression, anxiety, and decreased energy. (Tr. 497.) She reported starting a new job with an internet retailer and reported she "enjoys her job." (Tr. 499.) She said she was having three or four panic attacks per week at work and was not getting restful sleep. (Tr. 497, 499.) On examination, Ms. Prusak was "pleasant and cooperative"; she demonstrated fair attention and concentration and fair short- and long-term memory. (Tr. 497.) Her general fund of

9

knowledge and executive functioning were both good. (*Id.*) She was depressed and anxious during the appointment. (Tr. 500.) Ms. Prusak's medication was adjusted, and she agreed to follow up with her psychologist for psychotherapy. (Tr. 498.)

Ms. Prusak followed up with Dr. Mahi by telephone on April 26, 2021. (Tr. 489, 492.) Ms. Prusak complained of "flashbacks and nightmares" related to a past traumatic experience, starting two weeks prior. (Tr. 489.) She had been "doing well" before that. (*Id.*) Ms. Prusak reported that she had to take a medical leave of absence from work, had experienced "crying spells," had some suicidal thoughts, and experienced paranoia that people were "watching her." (Tr. 490.) Her mental status examination was largely unchanged except for the report of "worsening PTSD symptoms including nightmares and flashbacks." (*Id.*; *see also* Tr. 493.) Ms. Prusak's medication was adjusted, and Dr. Mahi discussed with her the possibility of seeking intensive outpatient treatment for trauma. (Tr. 493.)

Ms. Prusak followed up with Dr. Mahi again on May 17, 2021. (Tr. 483.) Ms. Prusak had continued depression and anxiety, along with an "increase in flashbacks and nightmares." (*Id.*) She continued to have passive suicidal thoughts three times per week. (*Id.*) On examination, Ms. Prusak was depressed and anxious, but she behaved appropriately and was oriented with intact and linear associations. (Tr. 484.) Ms. Prusak's medication was adjusted and outpatient treatment was discussed again. (Tr. 485.) She had good general hygiene, made good eye contact, and otherwise appeared largely normal. (Tr. 486.)

Ms. Prusak consulted with Dr. Amanda Rose, Psy.D., on May 20, 2021. (Tr. 481.) Dr. Rose noted that this was Ms. Prusak's first therapy appointment in nine months. (*Id.*) Ms. Prusak complained of severe depression and identified that her past traumas and family relationships were

primary stressors. (*Id.*) Dr. Rose's mental status examination noted that Ms. Prusak was within normal limits, except for a depressed mood and a flat affect. (Tr. 482.)

Ms. Prusak met with Dr. Mahi again on June 21, 2021. (Tr. 475.) Her mood was less depressed and she was sleeping better, with no flashbacks or nightmares. (*Id.*) She denied paranoia. (*Id.*) But Ms. Prusak complained of increased anxiety and panic attacks when she goes out; she also reported some impulsive spending which led to debt. (Tr. 475–76.) The mental status examination was largely normal except for a depressed and anxious mood and congruent affect. (Tr. 479.) Ms. Prusak also reported an incident where she was in a significant car accident after drinking alcohol. (Tr. 478.) She found out she was pregnant shortly thereafter. (Tr. 467.)

Ms. Prusak underwent a diagnostic assessment for an intensive outpatient program (IOP) on July 7, 2021. (Tr. 466.) Ms. Prusak described having depression since she was a teenager. (*Id.*) She said her first panic attack occurred in early 2021, and her panic attacks always occur at work. (Tr. 467.) She described having to leave work early due to her symptoms and ultimately taking a leave of absence. (*Id.*) She said her attacks tend to be triggered "when she is pressuring herself to increase her productivity at work." (*Id.*) Self-assessment scores indicated moderate depression and severe anxiety. (*Id.*) Ms. Prusak described a pattern of "low" periods, lasting two weeks, followed by "up" (manic) periods lasting two days. (*Id.*) She described hypervigilance and said she has had out-of-body experiences. (*Id.*) She candidly discussed struggling with alcohol abuse in the year prior to June 2021. (Tr. 468–69.) On examination, Ms. Prusak was "disheveled" with poor judgment; she was otherwise largely normal with an average mood and full affect. (Tr. 469–70.)

Ms. Prusak underwent a psychiatric assessment for purposes of the IOP on July 8, 2021. (Tr. 360–64; 460–61.) She described a difficult childhood and a traumatic experience that occurred in 2020. (Tr. 462.) Ms. Prusak reported that she believed her depression symptoms had been

improving since being prescribed Cymbalta but said she was still experiencing anxiety and panic, especially at work. (Tr. 460, 462.) She was having "minimal" panic attacks while staying at home, but when she was working she would have one every day and they would last two hours. (Tr. 462.) She described not getting restful sleep, but she said that medication had caused her nightmares to become less frequent. (*Id.*) She said she had poor memory and concentration and cannot read a book without becoming distracted. (*Id.*) She described being "afraid of people"; she is scared that people are judging her and cannot "have a normal conversation . . . without shaking or developing a rash." (*Id.*) On examination, Ms. Prusak presented with a sad mood and was fearful and anxious. (Tr. 465.) But she was "[p]leasant and interactive," euthymic, and engaging, with a full affect, complete orientation, and intact associations. (*Id.*) The certified nurse practitioner conducting the assessment—Kelley Castro—noted that the treatment plan was for Ms. Prusak to begin a virtual IOP on July 12, 2021, attending four days per week for four to six weeks. (*Id.*)

Ms. Prusak attended her first IOP group session as planned. (Tr. 457.) She presented with a depressed and anxious mood but with a cooperative attitude, an appropriate affect, logical thought processes, and normal speech and eye contact. (*Id.*) Ms. Prusak reported no major worries but said she was having difficulty sleeping and decreased concentration, with periods of high anger. (*Id.*)

At the group session the next day, Ms. Prusak reported decreasing worry. (Tr. 455.) She did not attend a session on July 14, 2021. (Tr. 454.) By July 15, 2021, Ms. Prusak presented with a pleasant mood. (Tr. 452.) She described her activity level as "low" but said her concentration was "ok." (*Id.*)

Ms. Prusak continued to participate in IOP group sessions. By July 19, 2021, Ms. Prusak reported no fear but some sadness and anger. (Tr. 450.) She reported some fear on July 20, 2021,

describing that she had a nightmare regarding her pregnancy. (Tr. 448.) She described having gone to a package delivery store. (*Id.*) She continued to report "moderate to high" fear the next day, too. (Tr. 446.) Things were improved on July 22, 2021, with Ms. Prusak reporting a moderate mood and "good" activity, in that she had been doing chores. (Tr. 441.)

At a session on July 26, 2021, Ms. Prusak presented as depressed for the first time in several sessions. (Tr. 436.) She described having urges to isolate herself and said her sleep had been worse since her fiancé's children were staying over. (*Id.*) She had not had many thoughts of worry, her concentration had been "fine," and her activity level was "hit or miss." (*Id.*) She continued to express fears of crowded areas, "unknown locations," and failure. (Tr. 437.)

Ms. Prusak missed a session on July 28, 2021, because she was sick. (Tr. 435.) She also missed another session on July 29, 2021, and she withdrew from the program. (Tr. 433.) Ms. Prusak said that she could not financially afford to participate any longer, and she also reported that her nausea kept her from attending the sessions. (*Id.*)

At a prenatal appointment on September 15, 2021, Dr. Sara Wiswell noted that Ms. Prusak's mood was "stable." (Tr. 430.)

Ms. Prusak consulted virtually with psychiatric physician assistant Sindhu Kurup on September 22, 2021. (Tr. 314.) Ms. Kurup's review of symptoms was unremarkable, and Ms. Prusak had a euthymic mood. (Tr. 318.) Ms. Kurup made certain medication changes. (Tr. 321.)

Ms. Prusak followed up with Ms. Kurup virtually on September 29, 2021. (Tr. 310.) Ms. Kurup noted that Ms. Prusak was "doing well on current medications," with a stable mood. (*Id.*) She was again euthymic with a full affect. (Tr. 311.)

Ms. Prusak had a therapy appointment with Dr. Rose on October 8, 2021. (Tr. 427.) Dr. Rose noted that Ms. Prusak's last appointment was five months ago. (*Id.*) Ms. Prusak reported that

13

her mood was relatively stable. (*Id.*) She described some family strain but was excited about organizing her house to accommodate a new baby. (*Id.*) Dr. Rose noted no abnormal mental status or behavioral observations except for a flat affect. (Tr. 428.)

Ms. Prusak consulted with Dr. Anya Verriden, Ph.D., on October 17, 2021. (Tr. 358.) Dr. Verriden noted that Ms. Prusak's symptoms related to bipolar disorder, anxiety, and depression "appear stabilized or mild at this time." (Tr. 359.) But Dr. Verriden noted an impression diagnosis of ADHD "with significant executive functioning issues." (Tr. 358.)

Ms. Prusak next met with Dr. Rose on November 3, 2021. (Tr. 423.) Ms. Prusak described decreased anxiety and panic, which she attributed to her medication and her pregnancy. (Tr. 423–24.) She said she has been "assertive" at her work and liked her job better than the last place she worked. (Tr. 424.) Ms. Prusak said she did not believe she had bipolar disorder, and Dr. Rose noted that this "is likely the case." (*Id.*) Dr. Rose noted no abnormal mental status or behavioral observations except for a flat affect. (Tr. 425.) She wrote that Ms. Prusak's anxiety was "generally controlled" and her mood was "relatively stable." (*Id.*)

Ms. Prusak underwent an initial evaluation with a new psychiatric provider, Shannon Barrett, PA-C, on November 17, 2021. (Tr. 416.) Ms. Prusak again described a pattern of increased energy and impulsivity, followed by a "depressive episode," but she noted that her depressive episodes have improved. (Tr. 417.) While she has days of depressed mood, she had not had an episode lasting longer than two weeks since July 2021. (*Id.*) She also reported that her anxiety was improved, and she denied panic attacks. (Tr. 418.) A mental status examination was normal. (Tr. 420.) Ms. Barrett continued Ms. Prusak on her medication. (Tr. 422.)

Ms. Prusak's next appointment with Dr. Rose was on January 12, 2022. (Tr. 407.) Ms. Prusak reported that she was "generally doing well." (*Id.*) She describing wanting to go back to

14

school while on maternity leave. (*Id.*) Dr. Rose noted no abnormal mental status or behavioral observations except for a flat affect. (Tr. 408.) Dr. Rose noted that Ms. Prusak's anxiety had been mild and her depression score, while slightly elevated, could be attributable to her physical health and pregnancy as opposed to her depression. (*Id.*)

Ms. Prusak followed up with Ms. Barrett on January 26, 2022. (Tr. 402.) Ms. Prusak reported that she was doing "pretty good." (*Id.*) She denied panic attacks and said her mood, anxiety, and depression had been "good" despite a significant stressor involving a parent. (*Id.*) She endorsed increased nightmares and trouble sleeping, normally focused on that stressful situation. (*Id.*) A mental status examination contained all normal findings. (Tr. 403.) Ms. Prusak was continued on her medication. (Tr. 405.)

On March 22, 2022—in the month after Ms. Prusak gave birth—she described to Ms. Barrett being more anxious, "down," and irritable. (Tr. 398.) Ms. Prusak had "racing thoughts" about her responsibilities and increased depression symptoms. (*Id.*) She was continued on her medication and was encouraged to schedule another appointment with Dr. Rose. (Tr. 400.)

At a primary care appointment on April 18, 2022, Ms. Prusak reported that she has "has some depression" but "overall she is stable." (Tr. 339.)

At an appointment with Ms. Barrett on May 2, 2022, Ms. Prusak reported that that she was feeling "a little rough." (Tr. 386.) She said she had stopped taking some of her medication and felt that her dosage of Cymbalta was not sufficient. (*Id.*) She described having three days of high energy and impulsivity, during which she will clean a lot and is easily irritated, followed by a period of depressed mood. (*Id.*) She reported high anxiety, with racing thoughts. (*Id.*) On examination, Ms. Prusak was anxious and labile. (Tr. 387.) Ms. Barrett made certain medication changes. (Tr. 388.)

15

Ms. Prusak had stabilized somewhat by the time of her next appointment with Ms. Barrett on May 27, 2022. (Tr. 380.) Ms. Prusak said she was "alright" and said she was cleaning "constantly," describing it as a new "obsession." (Tr. 381.) She reported being "constantly anxious" and restless but denied panic attacks. (*Id.*) She was again anxious and labile on examination. (Tr. 382.) Ms. Barrett made medication changes. (Tr. 384.)

Ms. Prusak had a therapy appointment with Dr. Rose on June 13, 2022—her first appointment in six months. (Tr. 377.) Ms. Prusak said she had decided "to stay home with her daughter vs returning to work." (Tr. 378.) She said her emotions had been "all over the place," with some days of high energy and some days where she does not do anything all day. (*Id.*) She also complained of high anxiety, "especially when going out to the store and being around others with her daughter." (*Id.*) She said she worries about other people and described hypervigilance, feeling "like a guy may have been following her in the store." (*Id.*) She reported having "gory" nightmares focused on her daughter "being hurt or taken." (*Id.*) Dr. Rose counseled Ms. Prusak on how isolation at home could contribute to feelings of depression. (*Id.*) Ms. Prusak said she had bought a new dog. (*Id.*) Ms. Prusak's mental status was normal except for an anxious affect. (Tr. 379.)

Ms. Prusak followed up with Ms. Barrett on June 24, 2022. (Tr. 374.) Ms. Prusak described high anxiety, saying that she "cannot go anywhere," and described having out-of-body experiences and nightmares. (*Id.*) She identified her family and financial concerns as her primary stressors. (*Id.*) Ms. Barrett made medication changes. (Tr. 377.)

Ms. Prusak reported excessive cleaning at her next appointment with Dr. Rose, on July 18, 2022. (Tr. 371–72.) She complained of high anxiety regarding her daughter's wellbeing and said she had not been leaving the house "due to fear and worry." (*Id.*) They discussed activities to get

Ms. Prusak out of the house more often. (Tr. 372.) A mental status examination contained normal findings except for an anxious affect. (Tr. 372–73.)

Ms. Prusak followed up with Ms. Barrett on July 29, 2022. (Tr. 600.) Ms. Prusak reported that she had forgotten to take her medicine for three days and is now only taking them every other day. (*Id.*) She lost one of her prescription bottles. (*Id.*) She complained that her anxiety is "always at a high time high" and that she was still having trouble sleeping. (*Id.*) She denied panic attacks. (Tr. 601.) She presented with an anxious and labile mood and anxious affect. (Tr. 602.) Ms. Barrett continued Ms. Prusak on her medication and counseled her on adhering to her medication schedule. (Tr. 603.)

Ms. Prusak met with Dr. Rose on August 15, 2022. (Tr. 597.) She had slightly decreased scores for anxiety and depression as she worked to reestablish a medication routine. (*Id.*) Ms. Prusak described that she was anxious "the whole time" on a recent trip to a grocery store. (*Id.*) She presented with a depressed mood and a sad and irritable affect. (Tr. 598.)

Ms. Prusak followed up with Ms. Barrett on September 1, 2022. (Tr. 593.) Ms. Prusak reported doing better with adhering to her medication schedule and was trying to get out of her home more frequently. (Tr. 593–94.) She described continued hypervigilance and increased depression symptoms. (*Id.*) She also said she finds herself being distracted and having trouble focusing and following things she reads. (Tr. 594.) She presented as anxious and labile with an anxious affect. (Tr. 595.) Ms. Barrett made a medication change and continued to emphasize medication adherence. (Tr. 596.)

Ms. Prusak met with Dr. Rose for therapy on September 19, 2022. (Tr. 590.) Ms. Prusak described continued anxiety at home, excessive cleaning, and losing focus easily. (Tr. 591.) She said she had considered returning to work, "but it wouldn't be worth it since the cost of childcare

is high." (*Id.*) Ms. Prusak said that she takes her daughter places but had been struggling to engage in mindfulness exercises. (*Id.*) Ms. Prusak stopped going to her nutritionist, saying that it made her anxious. (*Id.*) She presented with a depressed mood and a flat affect. (Tr. 592.)

Ms. Prusak followed up with Ms. Barrett on October 10, 2022. (Tr. 586.) Ms. Prusak complained of trouble sleeping and nightmares and said she was having "highs and lows" throughout the day, short periods of high energy followed by low periods and sometimes very low periods, when she will want to cry "for no reason." (*Id.*) She described continued anxiety, fear that something bad will happen, and difficulty focusing. (*Id.*) She said she was trying to take courses on personal training but found herself unable to focus, which leads to frustration. (*Id.*) She presented with an anxious and labile mood and an anxious affect. (Tr. 588.) Ms. Barrett made medication changes. (Tr. 589.)

Ms. Prusak met with Ms. Barrett again on November 10, 2022. (Tr. 582.) She reported that she was doing "alright" except that she had significant insomnia and recurring nightmares about one of her parents. (*Id.*) Ms. Prusak had plans to celebrate an anniversary and Veteran's Day. (Tr. 583.) Her anxiety was "still there," and she continued to have "bouts of depression." (*Id.*) She presented with an anxious and labile mood and an anxious affect. (Tr. 584.) Ms. Barrett made medication changes. (Tr. 585.)

Ms. Prusak met Dr. Rose for therapy on November 14, 2022. (Tr. 579.) Ms. Prusak reported that she had little desire to leave the home because of anxiety. (Tr. 580.) Dr. Rose noted that she "seem[ed] to have little motivation/desire to engage in self-care or leave the house." (*Id.*) Ms. Prusak presented with a depressed mood and flat affect. (Tr. 581.) Dr. Rose noted that Ms. Prusak had not seemed to benefit from treatment with Dr. Rose, and she suggested that Ms. Prusak consider finding another provider. (*Id.*)

18

Ms. Prusak met with Dr. Rose again two months later, on January 25, 2023. (Tr. 626.) Ms. Prusak described significant relationship stressors that occurred after their last appointment. (*Id.*) She presented with a depressed mood and a flat affect. (Tr. 627–28.) Dr. Rose identified that Ms. Prusak's symptoms had not significantly changed but noted that Ms. Prusak had not actively implemented the interventions they had discussed. (Tr. 628.)

Ms. Prusak underwent a psychological examination focusing on attention issues with Dr. DeAnna Frye, Ph.D., on May 18, 2023 and May 26, 2023. (Tr. 643, 707, 715.) Dr. Frye opined that testing did not provide evidence of attention disruption and that Ms. Prusak's attention was commensurate with her peers. (Tr. 645.) The testing indicated "significant affective distress characterized by depressive and anxiety symptoms," although Dr. Frye noted that "it appears . . . likely that her responses reflect current life stresses." (*Id.*) Dr. Frye noted that Ms. Prusak's test results were similar to others who are "stress reactive" with a low frustration tolerance and excessive worry. (Tr. 645.) Ms. Prusak presented normally with a euthymic mood. (Tr. 643.) Ms. Prusak reported being independent with respect to the activities of her daily living, but she noted that her fiancé cooks, shops for groceries, and manages their finances. (Tr. 644; *see also* Tr. 707.) Ms. Prusak again suggested an interest in pursuing a career as a personal trainer. (Tr. 644.)

Ms. Prusak wrote a note to an online patient portal on May 24, 2023, complaining that she finds herself picking her skin. (Tr. 728.) She further described needing to listen to music while driving in order to focus. (*Id.*)

After a five-month hiatus, Ms. Prusak met with Dr. Rose again on June 12, 2023. (Tr. 690.) Ms. Prusak reported that she has not experienced a significant bout of depression in one or two months. (*Id.*) She said she has days of feeling "down" but had been trying to be more mindful of

her anxiety. (*Id.*) She reported that she and her partner were planning to participate in couple's counseling. (*Id.*)

At an appointment with Dr. Rose on August 31, 2023, Ms. Prusak reported that she has "good days when she can complete tasks" but some days lacks motivation. (Tr. 670.) She said she felt overwhelmed with managing things at home, including caring for her daughters and routinely caring for her fiancé's two children. (*Id.*) She told Dr. Rose that she only left the house twice per month, both due to financial constraints and because she does not want to deal with other people. (*Id.*) She engages in social events with family, goes to a neighborhood store more frequently, and met up with a friend for a nail appointment. (*Id.*) Dr. Rose discussed possible goals, including exercise and socialization, but Ms. Prusak "expressed a minimal desire to change." (Tr. 671.) Ms. Prusak admitted that she had not seen psychiatry professionals in a few months and expressed a desire to return for therapy "in a few months." (*Id.*) Her mental status examination was normal except for a depressed mood and flat affect. (Tr. 672.)

## IV.    THE ALJ'S DECISION

The ALJ determined that Ms. Prusak meets the insured-status requirement of the Social Security Act through December 31, 2027, and that she had not engaged in substantial gainful activity since January 30, 2022, the alleged disability onset date. (Tr. 19–20.)

The ALJ next determined that Ms. Prusak had the following severe impairments: (1) major depressive disorder, (2) generalized anxiety disorder, and (3) post-traumatic stress disorder. (Tr. 20.)

The ALJ also noted that Ms. Prusak had a history of the following non-severe impairments: diastasis recti and a body mass index of over 30. (*Id.*) However, the ALJ found these conditions to be non-severe, as they were both related to a pregnancy. (Tr. *Id.*) The ALJ noted that he considered all of Ms. Prusak's conditions, both severe and non-severe, when determining Ms. Prusak's

20

residual functional capacity. (*Id.*)

The ALJ determined that none of Ms. Prusak's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

The ALJ further determined that Ms. Prusak had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with the following non-exertional limitations:

> She can attend to and carry out multi-step tasks of a routine, repetitive nature, but not at a production rate pace (for example assembly line work). She can interact with others on an occasional and superficial basis (which is defined as, no arbitration, negotiation, conflict resolution, or responsibility for the welfare of others). She can adapt to infrequent changes that are explained or demonstrated in advance.

(Tr. 22.)

The ALJ found that Ms. Prusak was 25 years old on the alleged disability onset date and had at least a high school education. (Tr. 27.) But the ALJ determined that Ms. Prusak was unable to perform her past relevant work as shipping and receiving clerk or as an assistant manager. (Tr. 26–27.)

However, the ALJ determined that—considering Ms. Prusak's age, education, work experience, and RFC—there were jobs that existed in significant numbers in the national economy that Ms. Prusak could perform, including work as a "kitchen helper" (DOT 318.687-010), "floor waxer" (DOT 381.687-034), or "laundry worker" (DOT 361.685-018). (Tr. 27–28.) Accordingly, the ALJ determined that Ms. Prusak is not disabled. (Tr. 28.)

## V.        LAW & ANALYSIS

### A.        Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails

22

to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

**B.** **Standard for Disability**

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations

direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

### C. <u>Analysis</u>

In her assignment of error, Ms. Prusak contends that the ALJ mischaracterized the evidence, made factual errors, and selectively included portions of the record supporting the ALJ's RFC while ignoring those portions of the records that would be inconsistent with it. (Pl.'s Merit Br., ECF No. 9, PageID# 791.)

She points first to the ALJ's reliance on Ms. Prusak's ability to care for her infant daughter, manage her own hygiene, and complete household chores. (*See id.* at PageID# 789 (citing Tr. 21)). Ms. Prusak argues that this reliance ignores statements in the medical records indicating that Ms. Prusak's ability to complete chores fluctuated with her energy levels, that Ms. Prusak suffered from significant anxiety and obsessive behaviors regarding her daughter's care and safety, and that Ms. Prusak at times struggled to see to herself due to depression and anxiety. (*Id.* (citing Tr. 371–72, 381, 581, 626)).

Second, she points to the ALJ's reliance on Ms. Prusak's ability to live independently while caring for her own daughter and, at times, her fiancé's children as well. (*Id.* at PageID# 789 (citing Tr. 21–22)). Ms. Prusak argues that her ability to do so is not inconsistent with her allegations about the nature and severity of her symptoms, and she points out that she repeatedly reported feeling overwhelmed by her responsibilities at home. (*Id.* at PageID# 790 (citing Tr. 670)).

Third, Ms. Prusak contends that the ALJ relied upon normal findings from mental status examinations in the record but failed to acknowledge findings of a depressed or anxious mood, or flat or anxious affect. (*Id.* (citing Tr. 23–24, 373, 376, 378 – 79, 382, 387, 425, 482, 493, 672)).

Fourth, Ms. Prusak points to what she sees as factual misstatements in the ALJ's decision. She notes that the ALJ characterized a mental status examination on January 25, 2023, as "unremarkable" despite a finding that Dr. Rose observed a depressed mood and flat affect. (*Id.* (citing Tr. 25, 628)). She notes that, while the ALJ found that Ms. Prusak did not attend counseling sessions after June 2023, there is a record indicating that Ms. Prusak consulted with Dr. Rose on August 31, 2023. (*Id.* at PageID# 791 (citing Tr. 669–71)).

Finally, Ms. Prusak argues that the ALJ relied too much on a one-off note in Dr. Frye's record from May 2023 indicating that Ms. Prusak was taking a personal training class and desired to explore being a personal trainer. (*Id.* at PageID# 790 (citing Tr. 21, 22, 25, 26)).

Ms. Prusak says that these alleged failures demonstrate that the ALJ's RFC is not supported by sufficient evidence. Ms. Prusak argues that the record supports a finding that she has severe anxiety that affects her ability to the leave the house such that she cannot reasonably be expected to sustain work activity. (*Id.* at PageID# 792 (citing Tr. 361, 371–72, 374, 378–79, 580, 626, 670)). She argues that the ALJ's finding to the contrary fails to acknowledge the unique challenges posed by mental health and non-exertional limitations, despite agency guidance in SSR 85-15. *See* SSR 85-15, 1985 WL 56857, *6 ("[T]he reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances. The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day.").

The Commissioner defends the ALJ's decision as a reasonable resolution of any inconsistencies in the record evidence. (Def.'s Merit Br. at 7, PageID# 802.) The Commissioner argues that Ms. Prusak is merely asking the Court to reweigh the evidence, which is beyond the Court's standard of review. (*Id.* (citing *Hays v. Comm'r of Soc. Sec.*, Case No. 1:20-2243, 2021 WL 6503788, at *15 (N.D. Ohio Nov. 1, 2021))). The Commissioner argues that substantial evidence supports the RFC, pointing to: (1) records from 2021 that report Ms. Prusak as "doing well" and her symptoms stabilized (*see id.* (citing Tr. 310–11, 358–59, 416–20)); (2) records from "numerous examinations" in 2022 and 2023, wherein Ms. Prusak's mental-status examinations were largely normal (*see id.* (citing Tr. 375, 382, 399, 403, 584, 592, 602, 627)); and (3) the May

2023 neurocognitive assessment that showed "no evidence of disruption related to sustained attention, inattention, vigilance, or impulsivity" (*see id.* (citing Tr. 643–44)).

The Commissioner further argues that "'a claimant's capacity to perform tasks in daily living is a legitimate factor to be considered in assessing the claimant's functional capacity.'" (*Id.* at 9, PageID# 804 (quoting *Schuster v. Comm'r of Soc. Sec.*, No. 4:23-CV-121797, 2024 WL 1217197, at *21 (N.D. Ohio Jan. 30, 2024)). The Commissioner contends that the ALJ's reliance on Ms. Prusak's ability to care for her household and herself was therefore permissible and reasonable.

Finally, the Commissioner argues that the ALJ reasonably relied on the opinions of the state agency medical consultants, who found that Ms. Prusak retained the ability to sustain employment. (*Id.* at 10, PageID# 805.) For all these reasons, the Commissioner concludes that substantial evidence supports the RFC.

After careful consideration, I agree with the Commissioner.

As an initial matter, Ms. Prusak is correct that the ALJ incorrectly stated that she stopped going to counseling in June 2023. (*See* Tr. 25–26.) Ms. Prusak attended one further therapy session in August 2023. (Tr. 670.) I view this statement as an immaterial error. The context of the statement makes clear that the ALJ was noting an inconsistency between Ms. Prusak's hearing testimony— in which she testified that she had been attending monthly therapy sessions before changing her appointments to be every other month "to leave [herself] with more time to work on the exercises"—and Dr. Rose's records. (*See* Tr. 25–26, 45.) The ALJ is materially correct in his finding of an inconsistency. Contrary to Ms. Prusak's testimony, Dr. Rose's notes reflect inconsistent attendance at therapy and note that Ms. Prusak seemed uninterested or unmotivated to work on the exercises she learned in therapy. (*See, e.g.*, Tr. 481 (nine months between

27

appointments), 427 (five months), 377 (six months), 591 (struggling to engage in exercises), 628 (did not attempt to use exercises)). Dr. Rose's note from the August 2023 appointment similarly reflected her observation that Ms. Prusak "expressed a minimal desire to change," had not been seeing her psychiatry professionals, and wanted to return to therapy "in a few months." (Tr. 671.)

I similarly find that the ALJ summarized the medical evidence in a materially accurate way. While Mr. Prusak is correct that the ALJ pointed to places in the record where mental status examinations reflected normal findings and characterized Dr. Rose's January 2023 mental status examination as "unremarkable" despite a finding of a depressed mood and flat affect, the ALJ accurately summarized Ms. Prusak's long history of reported depressive and anxious symptoms. (*See* Tr. 22–26.) The ALJ found that Ms. Prusak did indeed suffer from severe impairments of depression and anxiety and further found that those impairments could reasonably be expected to cause her symptoms. (Tr. 20, 23.) Having made those findings, I do not view it as unreasonable for the ALJ to then point to those places in the record where examinations revealed normal findings as the ALJ explained why Ms. Prusak's symptoms are less than disabling. This is not a case of "cherry-picking." *See, e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *see also Ackles v. Colvin*, No. 3:14-CV-249, 2015 WL 1757474, at *6 (S.D. Ohio Apr. 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

As for Ms. Prusak's argument that the ALJ relied too extensively on her activities—including her ability to care for her child, her fiancé's children, her expressed interest in becoming a personal trainer, and other activities—I am convinced that substantial evidence supports the RFC.

"The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (*quoting Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). A reviewing court may not "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (*quoting Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)).

The ALJ correctly noted that Ms. Prusak has had a long history of depression, anxiety, and PTSD, and that—despite her testimony to the contrary—her symptoms improved when she was receiving stable mental health treatment. (Tr. 23.) As 2021 progressed into 2022, records reflect that Ms. Prusak reported improvement with medication and providers assessed her symptoms to be stabilizing. (*See* Tr. 311, 339, 359, 402, 407, 418, 423–24, 427, 455, 460, 462, 475.) The ALJ acknowledged that Ms. Prusak's reported symptoms increased in severity after the birth of her child, but the ALJ correctly noted that Ms. Prusak reported difficulty maintaining her medication schedule beginning in 2022 and began making self-imposed medication changes. (*See* Tr. 24.)

Furthermore, the ALJ correctly noted that Ms. Prusak cared for her child and, routinely, her fiancé's children, and was able to complete chores (sometimes cleaning too obsessively) and attend infrequent social gatherings despite her symptoms. (Tr. 26.) Ms. Prusak at times endorsed a

desire to return to work and stated on one occasion that her desire to stay out of the workforce was due to the cost of childcare.

The Commissioner is also correct that the ALJ's RFC is supported by the findings of the state agency consultants, a point that Ms. Prusak does not dispute.

I am convinced that a reasonable mind might accept this evidence as adequate to support the ALJ's conclusion that Ms. Prusak retains the ability to attend to and carry out multi-step tasks of a routine, repetitive nature in the absence of a production-rate pace, interact with others on an occasional and superficial basis, and adapt to infrequent changes that are explained or demonstrated in advance. *See Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

Because substantial evidence supports the ALJ's weighing of the evidence, remand is not warranted. *See Jones*, 336 F.3d at 477. To the extent Ms. Prusak believes the ALJ should have weighed the evidence differently and imposed greater limitations, it is not a reviewing court's role to second guess the ALJ's determination. *Id.*

I therefore recommend that Ms. Prusak's assignment of error be overruled.

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

Dated:  June 25, 2025                             /s *Jennifer Dowdell Armstrong*
                                                  Jennifer Dowdell Armstrong
                                                  U.S. Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within**

**fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the

31

interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878–79 (6th Cir. 2019).